IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br><br>v.<br><br>**MANUELI VARGAS-CAMACHO,**<br><br>Defendant. | CRIMINAL NO. 25-155 (FAB) |

**THE UNITED STATES OF AMERICA'S RESPONSE
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT ON
SECOND AMENDMENT GROUNDS (ECF NO. 27)**

TO THE HONORABLE COURT:

COMES NOW the United States of America by and through the undersigned attorneys and before this Honorable Court very respectfully states and prays as follows:

### I.     INTRODUCTION

On March 26, 2025, a federal grand jury in this district returned an indictment against Manueli Vargas-Camacho for possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). (ECF No. 13.)

On September 4, 2025, the Defendant filed a motion to dismiss the indictment on Second Amendment grounds, relying on the Supreme Court decision *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). (ECF No. 27.) Defendant argues that Section 922(k) is an unconstitutional restriction on his right to possesses a handgun for self-defense.

For all the reasons stated herein, Defendant's motion should be denied.

### II.     RELEVANT FACTS

On March 22, 2025, at approximately 12:00 a.m., Homeland Security Investigations (HSI) personnel were assisting in the execution of various business checks in Guaynabo, Puerto Rico. At

approximately 4:05 am, agents arrived at a business named "La Cuestita". Upon arrival, HSI personnel observed an individual later identified as Manueli Vargas-Camacho, flee the establishment. HSI personal followed Vargas-Camacho and gave him verbal commands to stop. The Agent observed that Vargas-Camacho was holding a firearm and subsequently tossed the firearm underneath a parked vehicle. Vargas-Camacho was placed under arrest and the following items were recovered from the underneath of the beforementioned vehicle next to where Vargas-Camacho was arrested: (1) One Smith and Wesson Pistol with an obliterated model and serial number (loaded with one round in the chamber); (1) One silver magazine loaded with (6) rounds of .40 caliber ammunition. HSI read Vargas-Camacho his Miranda rights, which he proceeded to waive and interviewed him. Vargas-Camacho stated that he had found the firearm approximately one year ago, in an area in front of his residence. Vargas-Camacho stated that he had knowledge that the firearm had an obliterated serial number and that it was in those conditions when he found it. Vargas-Camacho also stated that he was a legal owner of a firearm for approximately seven to eight years, and that it was seized from him because of a prior criminal case against him. Vargas-Camacho stated that he tried to leave the establishment to get rid of the pistol because he knew he was not supposed to be in possession of a firearm.

### III.   DISCUSSION

18 U.S.C. § 922(k) makes it "unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered" or "to possess or receive" any such firearm that has, "at any time, been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(k). Congress adopted § 922(k)'s precursor in the Federal Firearms Act of 1938, which made it unlawful "for any person to transport, ship, or knowingly receive in interstate or

foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered." Pub. L. No. 75-785, § 2(i), 52 Stat. 1250, 1251. Congress included an almost identical provision in the Omnibus Crime Control and Safe Streets Act of 1968. Pub. L. No. 90-351, § 902, 82 Stat. 197, 231. It then added the prohibition on "possess[ing]" a firearm with an obliterated serial number as part of the Crime Control Act of 1990. Pub. L. No. 101-647, § 2202(b), 104 Stat. 4789, 4856. By its terms, § 922(k) does not apply to firearms manufactured or imported without serial numbers before 1968, when Congress required serial numbers on all new and imported firearms. *See* Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1223.

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. *Heller* said that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places," and "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27 & n.26. In *McDonald*, a plurality of the Court again emphasized that applying the amendment to the states "does not imperil every law

regulating firearms." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (opinion of Alito, J.).

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022), the Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen* struck down a New York law that required residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156. But, as Justice Kavanaugh emphasized in concurrence (joined by the Chief Justice), "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636). Justice Alito likewise echoed the point that *Bruen* does not "disturb[] anything that [the Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying guns." *Id.* at 2157 (Alito, J., concurring).

*Bruen* rejected the "two-step" Second Amendment framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125-26. Under that two-step framework, courts first engaged in a "historical inquiry . . . to determine whether the conduct at issue was understood to be within the scope of the [Second Amendment] right at the time of ratification." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). "If the challenged regulation burden[ed] conduct that was within the scope of the Second Amendment," then courts "move[d] to the second step of applying an appropriate form of means-end scrutiny." *Id. Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127. But the Court "decline[d] to adopt" the second step of that

framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126-27.

*Bruen* clarified the "standard for applying the Second Amendment." *Bruen*, 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation burdens such presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

*Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132. Thus, when considering "modern regulations that were unimaginable at the founding," the historical inquiry will "often involve reasoning by analogy." *Id.* In "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," courts must determine "whether the two regulations are relevantly similar," which will involve considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33 (quotation marks omitted). Thus, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when in engaging in an analogical inquiry." *Id.* at 2133 (emphasis and quotation marks omitted).

The Court emphasized that this "analogical reasoning . . . is neither a regulatory straitjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. "On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analogue' . . . ." *Id.* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). "On the other hand, analogical

reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

1. **Possession of a firearm with an obliterated serial number is not conduct protected by the Second Amendment's plain text.**

Under *Bruen*, the first question when considering the constitutionality of a firearms regulation is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. But that plain text cannot be read in isolation. "[T]he Second Amendment . . . codified a *pre-existing* right." *Heller*, 554 U.S. at 592. And the Supreme Court's interpretation of the Second Amendment's plain text in several cases demonstrates that the right does not extend to possession of a firearm with an obliterated serial number because such a firearm is not "typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, and is not necessary to protect the right to self-defense.

*Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," did not protect an unlimited right. *Id.* at 593. Instead, it provided that Protestants "may have Arms for their Defence suitable to their Conditions, and as allowed by Law," *id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Thus, *Heller* explained, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

*Heller* outlined several of the limitations inherent in the Second Amendment's text. It indicated that "prohibitions on carrying concealed weapons" were lawful under the Amendment.

*Heller*, 554 U.S. at 626. It said the Court was not calling into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. And, as "another important limitation on the right to keep and carry arms," the Court said that the Amendment applies only to "the sorts of weapons" that were "in common use at the time." *Id.* at 627 (quotation marks omitted). Thus, *Heller* said, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625.

Possession of firearms with an obliterated serial number is not protected by the Second Amendment's plain text for at least two reasons. First, firearms with obliterated serial numbers are not "typically possessed by law-abiding citizens for lawful purposes," even putting aside § 922(k)'s prohibition on such possession. *Heller*, 554 U.S. at 625. As the Third Circuit has observed, "we . . . cannot conceive of a lawful purpose for which a person would prefer an unmarked firearm." *United States* v. *Marzzarella*, 614 F.3d 85, 99 (3rd Cir. 2010). *See* David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and A Use-Reduction Strategy*, 59 Law & Contemp. Probs. 147, 174-75 (Winter 1996) (observing that the only reason to obliterate a serial number is to avoid being connected with a firearm that was stolen, involved in a crime, or obtained in a straw purchase). Thus, § 922(k)'s burden "will almost always fall only on those intending to engage in illicit behavior." *Marzzarella*, 614 F.3d at 99.

Second, § 922(k)'s prohibition does not "infringe" on the central right protected by the Second Amendment: the right to armed self-defense. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). *Heller* "held that individual self-defense is 'the *central component*' of the

Second Amendment right." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599). But "the presence of a serial number does not impair the use or functioning of a weapon in any way." *Marzzarella*, 614 F.3d at 94. A person desiring to defend himself can do so with either a serialized firearm or a pre-1968 or privately made firearm lacking a serial number. Such firearms are far more common and easier to obtain than those with obliterated serial numbers.

Any burden that § 922(k) imposes on the right to self-defense would be even less burdensome than other regulations that *Bruen* indicated do not infringe on that right. *Bruen* made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of the "shall-issue" firearm-carry licensing schemes that existed in 43 states. 142 S. Ct. at 2138 n.9. The Court explained that "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). And Justice Kavanaugh emphasized in his concurrence (joined by the Chief Justice) that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible, then § 922(k)'s ban on possession of firearms with obliterated serial numbers—a small class of hard-to-obtain firearms— is similarly constitutional because it does not "deny ordinary citizens their right to public carry." *Id.* at 2138 n.9 (majority opinion).

A law-abiding citizen would have no reason to remove a serial number from a firearm. Serial numbers are not a firearm accessory that can easily be removed at will; they are stamped or engraved into the firearm's receiver or frame. Defacing the serial number reduces the firearm's

value both by damaging the firearm's original finish and appearance and by making it much more difficult to trace the firearm's provenance and year of manufacture. And removing the serial number makes a firearm far less likely to be recovered if stolen. Only someone attempting to avoid detection of a past or future crime would have a motive to obliterate a serial number. See Marzzarella, 614 F.3d at 99. The Second Amendment does not protect such conduct, nor does it protect the right to possess such a firearm.

> **2. Section 922(k) is consistent with the Nation's historical tradition of firearms regulation.**

Even if the conduct regulated by § 922(k) were presumptively protected under the Second Amendment's plain text, the statute would be constitutional because it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. As explained below, § 922(k) is analogous to historical laws regulating firearms and gunpowder—most notably laws prohibiting alteration of proof marks on gun barrels.

Section 922(k) is consistent with a variety of historical laws regulating firearms and gunpowder. Well before serial numbers became common, colonial and state legislatures regulated firearms and the firearms trade. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc) ("[C]olonial governments substantially controlled the firearms trade."). For example, Connecticut banned residents from selling firearms outside the colony. *Id.* Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*." *Id.* at 685 n.18 (emphasis added; quotation marks omitted). And at least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also* 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319-320 (1899) (1763 law); Laws and Ordinances of New Netherland, 1638-1674 (1868)

at 18-19 (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance). Although not an exact analogy to § 922(k), these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands.

Additionally, several states had laws relating to the inspection and marking of gunpowder, which "was essential to the operation of firearms at that time," meaning that gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense." *Miller et al v. Bonta, et al.*, No. 3:19-cv-1537 (S.D. Cal. 2022) (Dkt. 137-3, at 22) (Declaration of Prof. Saul Cornell); *cf. Bruen*, 142 S. Ct. at 2149 (citing article by Cornell). In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (1810). In 1809, Massachusetts required the inspection of all gunpowder manufactured in the commonwealth or stored in a public magazine, with the inspector marking each cask as either "Massachusetts Inspected Proof" or "Condemned" and adding his name and the year. 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823). The law imposed a fine of between $200 and $500 on any person who sold any condemned powder or "fraudulently alter[ed], or deface[d] any mark, or marks, placed by any inspector upon any cask or casks containing gunpowder." *Id.* New Hampshire adopted a very similar law in 1820. Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).

Colonial and early state governments likewise prohibited the manufacture and transportation of gunpowder without a license. *See* Colonial Laws of Massachusetts Reprinted

from the Edition of 1672, at 126 (1890) (1651 statute) ("no person . . . shall transport any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute) (no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"); The Charter and Ordinances of the City of Providence, with the General Assembly Relating to the City 37 (1835) (1821 law) (prohibiting selling gunpowder within the town of Providence "without having a license therefor").

Most importantly, at least two states in the early republic required gun barrels to be proved and marked and prohibited the obliteration of the proof marks. *See Heller*, 554 U.S. at 605 (observing that examining the "public understanding of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation" (emphasis omitted)). In 1805, Massachusetts adopted a law for the appointment of "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them in exchange for a set fee. Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259 (1807). The law was adopted to prevent firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." *Id.*

Under the Massachusetts law, the prover was required to "stamp" the barrel "within one and an half inches of the breech" with the prover's initials, the letters "P." and "M.," and the year—all in "letters and figures . . . so deeply impressed . . . as that the same cannot be erased or disfigured." Laws of the Commonwealth of Massachusetts, *supra*, at 260. The act imposed a ten-dollar fine on any person who manufactured within the Commonwealth "any musket or pistol, without having the barrels proved and stamped as aforesaid." *Id.* at 260. It also imposed a ten-dollar fine for selling, delivering, or purchasing any unmarked musket or pistol manufactured in

the Commonwealth. *Id.* at 260-61. And it imposed a fine of between $20 and $50 for any person who "shall falsely forge or alter the stamp of any prover of fire-arms . . . impressed on any musket or pistol barrel." *Id.* at 261. Massachusetts slightly amended this act in 1814 but kept the provision prohibiting alteration of the prover's stamp. Laws of the Commonwealth of Massachusetts from February 28, 1807 to February 28, 1814 at 536-37 (1814).

Similarly, Maine in 1821 passed a law requiring the appointment of "suitable persons, to be provers of the barrels of all new, or unused firearms." Laws of the State of Maine 546 (1830). Each prover was required (in exchange for compensation) to "prove and try the strength of the barrels of all firearms which shall be offered to him for that purpose, in such manner as to satisfy himself of the strength of the same," to "in a permanent manner, mark and number every barrel by him so proved," and to provide a certificate attesting to the proof. *Id.* The statute imposed a ten-dollar fine on any person who "shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified." *Id.* Additionally, it imposed a fine of "not more than one hundred dollars, nor less than twenty dollars," for any person who "shall falsely alter the stamp or mark or the certificate of any prover of firearms." *Id.*

Although these statutes are not identical to § 922(k), they are "relevantly similar." *Bruen*, 142 S. Ct. at 2132. *Bruen* made clear that the government need only identify a "historical *analogue*, not a historical *twin*." *Id.* at 2133. The ultimate question is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. As explained above, § 922(k) imposes a minimal "burden on the right of armed self-defense" because marked firearms are pervasive and just as effective for self-defense as unmarked firearms. That burden is no greater than the burdens

imposed by historical laws relating to the sale and marking of firearms and gunpowder. And neither the historical laws nor § 922(k) deprived citizens of the use of firearms for self-defense. *See Holton*, 2022 WL 16701935, at *5 (observing that "[n]*ot removing* the serial number from a firearm" is a "negligible burden" compared to historical restrictions on firearm possession).

Section 922(k) is also "comparably justified." The historical regulations on commerce in firearms were designed to keep firearms out of the hands of those who might be dangerous, such as (in the view of legislators at the time) Native Americans. And the laws requiring marking of gun barrels and gunpowder were designed to protect citizens from explosions and to allow unsafe barrels or powder to be traced to the inspector who first affixed the markings. Section 922(k) serves similar purposes by allowing authorities to recover stolen firearms and trace firearms that have been used in a crime. *See Marzzarella*, 614 F.3d at 98; *United States v. Mobley,* 956 F.2d 450, 454 (3d Cir. 1992). Although § 922(k) does not reflect precisely the same legislative priorities as these historical regulations, it nevertheless imposes a "comparable burden" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133.

## IV.     CONCLUSION

Under the Bruen Framework, § 922(k) does not burden conduct protected by the Second Amendment's plain text. In interpreting that text, the Supreme Court has definitively said that the Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller* at 625. Firearms with obliterated serial numbers are not typically possessed by law-abiding citizens for lawful purposes. Furthermore, a review of "the Nation's historical tradition of firearm regulation" confirms that § 922(k) is constitutional. Since possession of such firearms is not protected by the Second Amendment, defendant's motion should be denied.

**WHEREFORE,** the Government respectfully requests that this Court deny defendant's motion to dismiss the Indictment (ECF No. 27).

**RESPECTFULLY SUBMITTED**,

In San Juan, Puerto Rico, on October 2, 2025.

                                            W. Stephen Muldrow
                                            United States Attorney

                                            *s/ Luis Rivera Mendez*
                                            Luis Rivera Mendez
                                            USDC/PR Bar No. 300709
                                            Special Assistant United States Attorney
                                            United States Attorney's Office
                                            Torre Chardón, Suite 1201
                                            350 Carlos Chardón Street
                                            San Juan, Puerto Rico 00918
                                            Tel. (787) 766-5656
                                            Email: luis.rivera.mendez@usdoj.gov

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*s/ Luis Rivera Mendez*
Luis Rivera Mendez
Special Assistant United States Attorney
