```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF PUERTO RICO
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>**Plaintiff**,<br><br>v.<br><br>MANUELI VARGAS-CAMACHO,<br><br>**Defendant**. | **Criminal No.** 25-155 (FAB) |

**OPINION AND ORDER**

BESOSA, Senior District Judge.

Before the Court is defendant Manueli Vargas-Camacho ("Vargas")'s motion to dismiss the indictment. (Docket No. 27.) For the reasons set forth below, Vargas's motion to dismiss the indictment is **DENIED**.

**I.   Background**

According to the government, on March 22, 2025, U.S. Homeland Security Investigations agents encountered Vargas while investigating a business in Guaynabo, Puerto Rico. (Docket No. 31 at pp. 1-2.)  At around 4:05 a.m., the agents arrived at the business, and upon noticing the agents' arrival, Vargas fled.  Id. The agents saw that Vargas was carrying a firearm, which he threw under a parked car while fleeing.  Id. at p. 2.  The agents arrested Vargas and, upon retrieving the firearm, discovered that it had an obliterated serial number.  Id.  Vargas waived his Miranda rights

and admitted that he knew the firearm had an obliterated serial number.  Id.  He claimed that the serial number was already obliterated when he came into possession of the firearm.  Id.

According to Vargas, he owns and operates a business called Manueli Pool Services, a pool cleaning service that operates mostly through cash.  (Docket No. 27 at p. 4.)  He is a lifelong resident of Guaynabo and a prominent member of the community.  Id.  Because he is well-known, he is also known to carry cash.  Id.  This statement, along with the fact that he was recently a victim of carjacking and several home burglaries, is why he chooses to carry a firearm for self-defense.  Id.  He holds a valid Puerto Rico firearm license.  Id.

A grand jury returned an indictment on March 26, 2025, charging Vargas with knowingly possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k).  (Docket No. 13.)  He moves to dismiss the indictment on the ground that section 922(k) is an unconstitutional burden on his Second Amendment right to possess a firearm.  See Docket No. 27.  The government responded, arguing that section 922(k) is constitutional.  See Docket No. 31.

## II. Legal Standard

Federal Rule of Criminal Procedure 12(b) allows a defendant to "raise by pretrial motion any defense, objection, or request

that the court can determine without a trial on the merits." See Fed. R. Crim. P. 12(b)(1). An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment must allege each of the required elements of the offense, but "the government need not put forth specific evidence to survive a motion to dismiss." United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015) (quoting United States v. Stewart, 744 F.3d 17, 21 (1st Cir. 2014)). On a motion to dismiss an indictment, a court takes the facts alleged in the indictment as true, mindful that "the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." United States v. Savarese, 686 F.3d 1, 7 (1st Cir. 2012). "[A] court must deny a motion to dismiss if the motion relies on disputed facts." United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018); see also Ngige, 780 F.3d at 502 (affirming district court denial of motion to dismiss the indictment where the defendant's argument "rested on factual disputes left to the factfinder.").

**III. Discussion**

Vargas moves to dismiss the indictment on the ground that section 922(k), which prohibits possession of "any firearm which

Criminal No. 25-155 (FAB)                                                          4

has had the importer's or manufacturer's serial number removed, obliterated, or altered," impermissibly infringes on his Second Amendment right to bear arms. He argues that, under N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), section 922(k) is unconstitutional because the government cannot demonstrate that prohibiting possession of a firearm with an obliterated serial number is "consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24; Docket No. 27 at pp. 2-5. The government disagrees. First, it argues that possession of a firearm with an obliterated serial number is not protected conduct under the plain text of the Second Amendment. (Docket No. 31 at pp. 6-9.) Second, it argues that section 922(k) bears sufficient similarity to historical analogues to withstand Vargas's constitutional challenge. Id. at pp. 9-13.

"[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." District of Columbia v. Heller, 554 U.S. 570, 592 (2008) (emphasis in original). "Like most rights, the right secured by the Second Amendment is not unlimited." Id. at 626. In Bruen, the Supreme Court "directed courts to examine the 'historical tradition of firearm regulation' to help delineate the contours of the right." United States v. Rahimi, 602 U.S. 680, 691 (2024) (citing Bruen, 597 U.S. at 17). Bruen is commonly

Criminal No. 25-155 (FAB)                                                   5

understood to delineate a two-step test.  See United States v. Price, 111 F.4th 392, 398 (4th Cir. 2024) (outlining the two-step Bruen test).  At the first step, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  Bruen, 597 U.S. at 17.  If the individual's conduct is covered by the plain text, the second step requires the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  Id.  When the government cannot make this showing, its regulation violates the Second Amendment.

Because times change, some current firearm regulations would have been unimaginable to the founders.  When applying Bruen to these regulations, courts must reason by analogy.  See id. at 28.  "A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances."  Rahimi, 602 U.S. at 693 (internal quotation marks and alterations omitted).  "Why and how the regulation burdens the right are central to this inquiry."  Id.  "[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations."  Id.  On the other hand, "analogical

Criminal No. 25-155 (FAB)                                            6

reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." Bruen, 597 U.S. at 30. "Historical regulations reveal a principle, not a mold," but "a court must be careful not to read a principle at such a high level of generality that it waters down the right." Rahimi, 602 U.S. at 740 (Barrett, J., concurring).

Although the First Circuit Court of Appeals has not addressed the constitutionality of section 922(k) post-Bruen, the Fourth Circuit Court of Appeals has done so at length in United States v. Price, 111 F.4th 392 (4th Cir. 2024). The majority opinion in Price found that section 922(k) is constitutional based on the historical tradition, delineated in Heller, limiting the Second Amendment's protections only to weapons "in common use for lawful purposes." Id. at 397; see Heller, 554 U.S. at 625, 627 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . [w]e think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual

weapons") (internal quotation marks omitted).[1]  After finding "no compelling reason why a law-abiding citizen would use a firearm with an obliterated serial number," the majority concluded that firearms with obliterated serial numbers are not weapons in common use for lawful purposes and, thus, not protected by the Second Amendment.  Price, 111 F.4th at 402-08.

Reaching the opposite conclusion, the second dissenting opinion in Price read Heller more narrowly.  Noting that both Supreme Court precedent and the historical statutes cited in Heller generally consider whether a firearm is dangerous and unusual based on "functional" characteristics, the dissent argued that "the government [may] ban the possession or carry of certain classes of weapon, as defined by their shared functional features, if those classes are dangerous and unusual."  Price, 111 F.4th at 432 (Richardson, J., dissenting).  For example, a sawed-off shotgun may be regulated because its short barrel length is a physical characteristic that impacts its functioning in a way that makes it

---

[1] Heller based this conclusion with reference to a variety of historical sources, both pre-and post-dating the adoption of the Second Amendment.  See 554 U.S. at 627 (citing 4 Blackstone 148-149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New-York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271-272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852); State v. Langford, 10 N. C. 381, 383-384 (1824); O'Neill v. State, 16 Ala. 65, 67 (1849); English v. State, 35 Tex. 473, 476 (1871); State v. Lanier, 71 N. C. 288, 289 (1874)).

Criminal No. 25-155 (FAB)                                                      8

dangerous and unusual.  The government may not, however, "ban the possession or carry of all weapons that have or don't have certain nonfunctional characteristics, even if weapons with those characteristics are unusual."  Id. at 430.  The dissent considered a serial number to be a nonfunctional characteristic because "whether a gun has or lacks a serial number does not change how the gun operates as a weapon so that it is more effective for one purpose or another."  Id. at 532.

    The Court finds that the majority is more persuasive and that section 922(k) is constitutional.[2]  Although handguns themselves are unquestionably in common use for a lawful purpose – they are "the quintessential self-defense weapon" – a handgun with an obliterated serial number is a different story.  Price, 111 F.4th at 403 (quoting Heller, 554 U.S. at 629).  The Court agrees with the observation that "there is no compelling reason why a law-abiding citizen would use a firearm with an obliterated serial number and that such weapons would be preferable only to those seeking to use them for illicit activities."  Price, 111 F.4th

---

[2] The Court does not feel it necessary to wade into the debate about whether the common use requirement identified in Heller ought to be employed on the first or second steps of the Bruen test.  See Bevis v. City of Naperville, 85 F.4th 1175, 1198 (7th Cir. 2023) ("There is no consensus on whether the common-use issue belongs at Bruen step one or Bruen step two.")  In the Court's view, it is sufficient to say that the founders understood the government to have the right to restrict possession of firearms that are not in common use for lawful purposes.  Whether these weapons did not qualify as "Arms," or whether they were understood to be outside the protective scope of the pre-existing right codified in the Second Amendment, does not affect the Court's conclusion.

Criminal No. 25-155 (FAB)                                              9

at 406 (citing United States v. Marzzarella, 614 F.3d 85, 95 (3d Cir. 2010). A firearm with a serial number is just as effective for self-defense, the "core" Second Amendment right, see Bruen, 597 U.S. at 18, as one without a serial number. Additionally, obliterating a serial number is not a trivial operation and not likely to occur accidentally or through inadvertence. As the government notes,

> [s]erial numbers are not a firearm accessory that can easily be removed at will; they are stamped or engraved into the firearm's receiver or frame. Defacing the serial number reduces the firearm's value both by damaging the firearm's original finish and appearance and by making it much more difficult to trace the firearm's provenance and year of manufacture. And removing the serial number makes a firearm far less likely to be recovered if stolen.
>
> (Docket No. 31 at pp. 8-9.)

The only plausible reason someone would obliterate a firearm's serial number would be to limit its traceability, which has obvious implications on what they intend to use it for. See Price, 111 F.4th at 419-21 (Quattlebaum, J., concurring) (explaining how "Heller and Bruen show us that logic and common sense are appropriate to consider when determining common use.")

The Court finds the second Price dissent's contrary argument unpersuasive for two reasons. First, the Court disagrees with its premise that a firearm's serial number is a purely "nonfunctional" characteristic. Although an obliterated serial number does not

Criminal No. 25-155 (FAB)                                        10

increase a pistol's rate of fire or firepower, it is not a mere aesthetic modification.  Instead, it is employed to enhance the weapon's stealth by reducing its traceability.  Cf. Price, 111 F.4th at 405 n. 7 (majority opinion) ("[F]irearms without serial numbers are more effective if one's purpose is to not have the government track their firearm").  In this sense, it is comparable to modifying a firearm by adding a silencer, which is also employed to limit detection.  Courts have found silencers to be dangerous and unusual because they are not commonly used for lawful purposes. See, e.g., United States v. Saleem, 659 F. Supp. 3d 683, 698 (W.D.N.C. 2023) ("[S]ilencers fall into the category of 'dangerous and unusual weapons' and are outside the scope of the Second Amendment's protection.")

Second, the Court rejects the Price dissent's narrower reading of the historical tradition.  Although the historical analogues do seem to define dangerous and unusual classes of firearms with reference to functional characteristics, see Price, 111 F.4th at 430-31 (Richardson, J., dissenting), the Second Amendment does not require courts to draw the narrowest possible principle from the historical sources.  Generalization is permitted, so long as the Court "faithfully [applies] the balance struck by the founding generation to modern circumstances." Rahimi, 602 U.S. at 693; cf. United States v. Trinidad-Nova, Crim.

No. 22-419 (FAB), 2025 U.S. Dist. LEXIS 194055, at *9-14 (D.P.R. Sept. 29, 2025) (Besosa, J.) (finding constitutional 18 U.S.C. § 922(g)(5)(A), which criminalizes firearm possession by unlawful immigrants, noting that the theory favored by the vast majority of federal courts "gives the government substantial latitude in justifying its current regulation by drawing a general principle from historical precedents").  Perhaps, historically, firearms were dangerous and unusual only by possessing an unorthodox functional characteristic.  Today that is not the case - firearms with obliterated serial numbers, which have no clear lawful purpose, are a prime example.  Although section 922(k) may not be "identical to [the] founding era regimes, [] it does not need to be."  Rahimi, 602 U.S. at 698 (majority opinion).  The fact that section 922(k) focuses on a class of weapons that are not commonly used for lawful purposes means that it fits neatly within the Nation's historic tradition of firearm regulation.

Accordingly, the Court finds that section 922(k)'s prohibition on possessing a firearm with an obliterated serial number does not infringe on Vargas's Second Amendment rights.

**IV. Conclusion**

For the reasons set forth above, Vargas's motion to dismiss the indictment is **DENIED**.  (Docket No. 27.)

Criminal No. 25-155 (FAB)                                              12

**IT IS SO ORDERED.**

San Juan, Puerto Rico, November 10, 2025.

                                    s/ Francisco A. Besosa
                                    FRANCISCO A. BESOSA
                                    SENIOR UNITED STATES DISTRICT JUDGE